CALHOUN v. FRASER.—126 S. W. (2d) 381.

Western Section. Feb. 17, 1938.

Petition for Certiorari Denied by Supreme Court, Jan. 21, 1939.

Lowell W. Taylor and John E. McCall, both of Memphis, for plaintiff in error.

Canale, Glankler, Loch & Little and Harold W. S. Leeker, all of Memphis, for defendant in error. .

SENTER, J.   The parties will be referred to as in the court below, Virginia Goshorn Calhoun, plaintiff, and Dr. J. F. Fraser, defendant.

Plaintiff sued the defendant for alleged malpractice in performing a mastoid operation from which facial paralysis resulted.

The declaration is in four counts. By the first count it is averred that before submitting to the operation plaintiff was assured by the defendant that only two risks were involved in performing the operation; that she might lose her hearing, and the usual risk involved in taking an anesthetic; that she relied upon the knowledge, ability and skill of the defendant and upon his assurance as to the risks involved, and submitted to the operation. It is averred that in the performance of the operation the defendant negligently and carelessly severed her facial nerve, and as a direct and proximate result of the negligence of the defendant in performing said operation she sustained a total and permanent paralysis of the right side of her face; that, after the defendant had negligently and carelessly severed the facial nerve, he negligently and carelessly failed to advise plaintiff of the nature and cause of the paralysis in time to have permitted her to undergo a subsequent operation for the relief of the facial paralysis condition; that the defendant assured plaintiff that the paralyzed condition of the face was temporary and that it resulted from the anesthetic, and that it would right itself in due time, and thereby caused her to refrain from consulting other physicians and surgeons until it was too late to correct the condition.

The second count is very similar to the first, and avers that in performing the operation the defendant negligently and carelessly severed the facial nerve, resulting in a total and permanent paralysis of the right side of her face.

The third count avers in substance that the defendant undertook to, and did perform the mastoid operation, but did so in a negligent and careless manner without exercising that degree of skill ordinarily exercised by specialist engaged in that particular branch of surgery, and as a direct and proximate result of the negligent and careless manner in which the defendant performed said operation, plaintiff sustained a facial paralysis.

By the fourth count it is averred that after the operation had been performed, and after the facial paralysis resulted from the operation, the defendant, without possessing the degree of knowledge, care and skill with which he was charged with possessing and which he held himself out as possessing, carelessly, negligently and erroneously advised plaintiff that the paralysis was due to the anesthetic and that it was temporary, and she required no special treatment; that if the defendant really had the knowledge and skill with which he was chargeable, he would have known that the paralysis was caused by a severance of the facial nerve, and the nerve could be repaired only by another immediate operation; that defendant failed to advise her as to the true cause of the paralysis until it was too late to repair the nerve successfully; that the defendant did not

exercise that degree of knowledge and skill which he represented himself as having and with which he was chargeable and which was ordinarily possessed and exercised by other surgeons specializing in diseases of the ear in the city of Memphis, Tennessee, and as a result the facial paralysis was rendered permanent and irreparable.

The defendant filed a plea of the general issue, and subsequently he was required by the court to plead specially the facts relied upon as defences. Whereupon, the defendant filed a plea setting forth certain facts and circumstances under which the operation was performed, and by which the averments in the respective counts of the declaration were traversed.

The pleadings when reduced down disclose that plaintiff rests her right to recover upon three distinct grounds. First, that the defendant did not possess and exercise the degree of knowledge and skill in the performance of the operation which he held himself out to possess and the degree of care and skill ordinarily and generally possessed by surgeons in that particular field of surgery that other surgeons in the city of Memphis possessed and exercised in performing an operation of this character. Second, that the defendant did not exercise that degree of care and skill in performing the operation that he was required to exercise, and that he performed the operation in an unskillful and negligent manner, resulting in severing the facial nerve causing total permanent paralysis of the right side of plaintiff's face from which her face was permanently distorted and blemished. Third, that after the operation was performed the defendant did not promptly disclose to plaintiff the serious effects resulting from his lack of skill, and advised plaintiff that the facial paralysis resulting from the operation was temporary in character and would right itself without further surgery, and did not discover or advise plaintiff differently until it finally developed that the facial nerve had been severed or so damaged that it would require additional surgery; that by reason thereof the additional surgery was delayed for several months and until it was too late to correct the condition and repair the damage.

At the conclusion of plaintiff's proof there was a motion by the defendant for a directed verdict in his favor. This motion was overruled. At the conclusion of all the evidence both the plaintiff and the defendant made motions for directed verdicts respectively in their favor. The motion for a directed verdict by plaintiff was overruled, and the motion for a directed verdict by the defendant in his favor was sustained, and the court accordingly directed the jury to return a verdict in favor of the defendant, taxing the plaintiff with the costs. From this action of the court plaintiff has appealed in error to this court and errors have been assigned.

The first and second assignments of error challenge the action of the court in overruling plaintiff's motion for a directed verdict and

in sustaining the motion of the defendant for a directed verdict. The third and fourth assignments are directed to the action of the court in admitting certain testimony offered by the defendant and excepted to by plaintiff and in excluding evidence referred to under the assignments.

We will first consider and dispose of the assignments of error directed to the action of the court in admitting the testimony complained of under these assignments.

The substance of the testimony complained of was the testimony of certain witnesses who qualified as experts in this particular field of surgery. No attack is made by plaintiff upon the qualifications of these witnesses as experts. They were permitted to testify, over the objections of plaintiff, that, in their opinion, it was possible for a surgeon in doing this type of surgery and in performing this type of operation, and exercising care and skill, to sever the facial nerve during the radical mastoid operation. This testimony was in the nature of answers to hypothetical questions. Proper basis was laid for the questions, and these medical experts, specializing in this particular field of surgery, were testifying from their knowledge of such operations, and especially with respect to the anatomy of the ear and the structure of the mastoid.

We do not think that the assignments of error based upon the theory that this evidence was an invasion of the province of the jury can be sustained. We know of no rule of evidence that would warrant the exclusion of this evidence, and especially under the facts as disclosed by the record. We are further of the opinion that the hypothetical questions were supported by evidence and that there was material evidence to support the hypothetical questions to which the medical experts answered.

It results that the third and fourth assignments of error are overruled.

Before entering into a discussion of the first and second assignments of error, which present the question that there was material competent evidence warranting the submission of the case to the jury, when considered in its most favorable aspect to plaintiff's case with all reasonable inferences to be resolved in favor of plaintiff, and to the end that we may have a more comprehensive understanding of the medical experts' evidence, we deem it important to refer to the nature and the anatomy of the mastoid region and the facial nerve and also the disease of mastoiditis.

It is established without contradiction that the mastoid process, or bone, lies behind the external ear, extending inwardly and being separated from the brain by a thin laminal bone. Externally, the mastoid process is covered by a layer of bone referred to as the cortex of the skull. This is a hard, solid bone about one-eighth of an inch thick. Immediately below, or internal to, the cortex of the skull,

are the pneumatic bone cells of the mastoid process, which lead to the mastoid antrum or cavity, inside the mastoid process. The pneumatic cells of the mastoid process are a porous or honeycomb type of bony substance. The tympanic cavity is that portion of the middle ear which is internal to the ear drum of the external ear, and is connected, internally, with the mastoid antrum by the aditus ad antrum, which appears to be a passageway between these two cavities. The mastoid antrum, the aditus ad antrum, and the tympanic cavity taken together are known and referred to as the middle ear. The cavity of the middle ear is only about three-fourths of an inch below the external surface of the skull and is entered, in the performance of the radical mastoid operation, not through the natural opening of the external ear, but by an incission made to the rear of the external ear and under the mastoid bone.

It is also shown that the mastoid area and the anatomical positions of the organs within the ear vary somewhat in individual cases. However it may be said that, as a general rule, the mastoid antrum, the aditus ad antrum, and the tympanic cavity have fixed locations in the mastoid region, unless where they have been destroyed or obliterated by the infection.

It is shown by the medical expert evidence that the facial nerve leaves the brain in the region of the pons, about one inch from the mastoid, and enters the temporal or mastoid bone at the internal auditory meatus, which is the opening from the middle ear to the internal ear. At this point the nerve enters a bony canal, known and referred to as the acqueductus fallopi and runs through the temporal or mastoid bone on a course that is internal to the mastoid antrum. As it continues the course, the facial nerve enters the middle ear where the aditus ad antrum joins the internal wall of the middle ear to the internal end of the external auditory canal. At this point the facial nerve is in front of the mastoid antrum and below the aditus ad antrum. The facial nerve canal is just under the ridge of the horizontal semi-circular canal and the horizontal semi-circular canal and the facial nerve canal, as they pass under the opening of the aditus ad antrum, are covered by the bridge of the aditus ad antrum. The facial nerve then traverses the internal wall of the middle ear for a very short distance and then turns downward, going below the middle ear, and passes out to the face through the stylo-mastoid-foramen. When the radical mastoid operation has been completed, the ridge of the facial nerve forms a portion of the floor of the field of the operation.

Plaintiff was suffering from the disease of mastoiditis, which is an infection which ordinarily begins in the cavity of the middle ear and spreads to the pneumatic cells of the mastoid process through the Aditus Ad antrum and the mastoid antrum. The infection may be either acute or chronic. Where the infection has destroyed the

ear drum and has been present for many years, accompanied by intermittent discharges from the ear, the infection becomes chronic.

It also appears from the medical expert testimony that chronic mastoid infection, because of the proximity of the mastoid area to the brain can, and often does, spread to the brain by eating through the small, thin laminal bone between the mastoid and the brain. It appears that when this occurs a brain abscess or meningitis usually results. It also appears from the testimony of Dr. Semmes that mastoiditis has a tendency to spread, and that intermittent discharge over a period of several years indicates an extensive and deepseated infection sufficient to eat into the bony region surrounding the seat of infection.

To the same effect is the testimony of Drs. Blassingame, Lewis, Anthony, and Fraser. (All specializing in this particular type of surgery.) It is also shown by the testimony of Drs. Blassingame, Ellett, Lewis, and Evans, that when the infection is chronic and has been present for many years, there is no possibility of accurately determining the extent or virulence of the infection until the mastoid region has been exposed and explored; that it can not be definitely told until exposure by making an incision, the exact field of the operation, the area that must be excavated, the amount of infected tissue and necrossed bone in the middle ear structures, and the amount of granulation tissue and other infectious growths in the field. These are matters which can be determined only after the mastoid has been opened. With respect to the above there is no conflict in the evidence.

It appears without conflict in the evidence that there are three types of mastoid operations, depending upon the extent of the infection. First, the simple mastoidectomy, which may be resorted to for the cure of an acute infection of a duration not exceeding several weeks. It appears that in this type of case, only the pneumatic cells of the mastoid process are involved by infection, and these are cleaned out, but the middle ear structures are left intact. The second type is referred to as the semi-radical mastoidectomy, which type of surgery is used in the cure of an infection that has existed for several months or perhaps a few years. In this type of case the patient has not entirely lost the hearing and an attempt is made to remove enough of the diseased tissue to give good results, and at the same time preserve what hearing the patient has. The third type is the radical mastoidectomy, which is the type of operation necessary in chronic cases of mastoiditis. In this type of case the patient has little or no hearing. The pneumatic spaces of the mastoid process, instead of being pneumatic, have solidified, and to prevent the possibility of the often fatal complications such as meningitis, brain abscess, and thrombosis of the lateral sinus, no attempt is made to preserve the ear drum cavity. Instead, the entire area is

excavated and sufficient tissue removed to provide adequate drainage so as to effect a cure.

The above reflects the substance of all the expert testimony, including the testimony of Dr. Semmes, an expert witness for plaintiff.

It also appears without conflict in the evidence that plaintiff had been afflicted with mastoid trouble since she was a child, and, hence the mastoiditis had reached the chronic stage, requiring the type of surgery referred to as radical mastoidectomy. According to the medical expert testimony this is not only a very tedious operation, but requires skill of a high order.

This brings us to a consideration and an analysis of the evidence introduced at the trial by the respective parties.

Plaintiff introduced as witnesses in her behalf herself, her husband, her uncle as lay witnesses and Dr. Eustace Semmes as a medical expert. By the three lay witnesses these facts were testified to : That plaintiff had suffered from some type of ear trouble almost from infancy, and that at the time she called to see Dr. Fraser, the defendant, she had practically lost her hearing. She first went to see Dr. Fraser in February, 1935, when her ear began discharging, and was advised by Dr. Fraser that she had mastoid trouble. Dr. Fraser first sought to relieve her trouble by external treatment; that after treating her for about two months by external treatments without appreciable relief, he then advised her that her condition could be cured permanently only by a mastoid operation, and recommended to her that she undergo the mastoid operation.

Plaintiff testified that she hesitated about undergoing this operation, but was assured by Dr. Fraser that the operation was comparatively simple and that the only risks involved were the risks of losing her hearing and the risk incident to taking ether. It also appears from plaintiff's testimony that prior to undertaking the operation Dr. Fraser advised plaintiff to procure the opinion of some other specialist. Her fiance, her present husband, then suggested that she advise with Dr. Phil M. Lewis, a recognized specialist in this field of surgery. Whereupon plaintiff consulted with Dr. Lewis who, after making some examination, concurred in the recommendation made by Dr. Fraser and to the effect that an operation was necessary to effect a cure.

It also appears from plaintiff's proof that Dr. Fraser, the defendant, informed plaintiff and her fiance, Mr. Calhoun, that he could not tell from an external examination whether he would have to perform a radical or simple operation, that this could be determined only after he had opened the mastoid process. It also appears from plaintiff's proof that Dr. Fraser informed Mr. Calhoun, the then fiance of plaintiff, and her present husband, that the infection, if the operation was not performed, might reach her brain, possibly causing death or insanity. Plaintiff testified that after dis-

cussing the subject with her family and Mr. Calhoun and relying upon Dr. Fraser's representations as to his skill and the risks involved, she underwent the operation which was performed while she was under ether by Dr. Fraser, assisted by Dr. Lewis. It is also shown by plaintiff's proof that prior to the operation plaintiff had no sign or indication of a facial paralysis.

It appears from the testimony of Mr. Calhoun that immediately after the operation he observed that plaintiff's mouth was drawn and he could tell that there was something the matter with her face, although plaintiff was still under the effects of the anesthetic at that time.

The operation began about 8:30 in the morning and the plaintiff did not regain complete consciousness until about 6 o'clock in the evening. She testified that she then noticed her face felt tight or drawn. She testified that she saw her face for the first time after her operation on the third day and her face was in the same condition at that time as it was at the trial and that there had been no improvement. Plaintiff saw Dr. Fraser the morning after the operation and he informed her that the operation had been successful; that when she saw her face in a mirror on the third day after the operation she made inquiry of Dr. Fraser about it, and that he told her the condition was temporary paralysis caused by iodine getting under the ether cone and that it would not last more than two weeks. Mr. Calhoun testified that he saw Dr. Fraser about fifteen minutes after the operation; that Dr. Fraser appeared to be nervous but told him that the operation had been successful, and that if anything seemed to be wrong with plaintiff's face the condition would be only temporary and would disappear within a few days.

Mr. Geshorn, plaintiff's uncle and a witness in her behalf, testified that he saw Dr. Fraser several days or a few weeks after the operation and that Dr. Fraser informed him that the operation had been successful and that the paralysis of the face was to be attributed to the shock of the operation and that it would come out all right.

Plaintiff also testified that she remained in the hospital for six days after the operation; that about four days after she left the hospital she saw Dr. Fraser at his office, where she had gone to have her wound treated. She testified that these visits and treatments continued every few days until the latter part of August, 1935; that during this time her ear continued to discharge; that each time she talked with Dr. Fraser about the condition of her face he told her that it was temporary and that something was probably pressing against the nerve. However, Dr. Fraser did not do anything to relieve the condition, but suggested to her that when she felt strong enough she should take electronic treatments to stimulate the nerve; that Dr. Fraser sent her, on one occasion, to see Dr. Lewis, and about four months after the operation Dr. Fraser sent her to

see Dr. Carrol Turner, who was unable to do anything for her, and thereafter Dr. Fraser sent her to Drs. Semmes and Blassingame, and that these two doctors, Semmes and Blassingame, recommended a second operation, and on October 22, 1935, they performed the operation; that thereafter, on November 16, 1935, they performed another operation, inserting a nerve graft; that until the first operation by Drs. Semmes and Blassingame her ear had continued to discharge and stopped about three weeks later. She testified that Dr. Blassingame stated to her that had she come to him in the first instance her facial nerve would not have been damaged.

Mr. Calhoun testified that Dr. Semmes and Blassingame told him, before they reopened Mrs. Calhoun's mastoid wound that the nerve had been severed, and that they operated the first time to determine whether to attempt to correct the severed nerve by suture or the graft method of repair.

The above is but a summary of the testimony of the lay witnesses introduced by plaintiff, but reflects the material facts testified to by these lay witnesses.

Dr. Eustace Semmes was the only expert medical witness introduced by plaintiff. Dr. Semmes specializes in nerve surgery. His deposition was taken by plaintiff some time before the trial of the case and his deposition was read in evidence by plaintiff. At the time his deposition was taken he was not cross-examined by the defendant, but was subpoenaed for cross-examination at the trial of the case. In considering his testimony we will first refer to his deposition.

He testified in substance that he specialized in surgery of the nervous system; that he first saw and examined plaintiff in September, 1935, and found that she was affected with facial nerve paralysis on the right side, following a former radical mastoid operation performed about four months prior to his examination; that he could not tell from the external examination whether the facial nerve had been severed, or just what caused the facial paralysis; that subsequently when he operated on plaintiff he found that the ends of the facial nerve were about one-half of an inch apart; that the bulbose end of the facial nerve, nearest the brain was located just outside of the semi-circular canal region; that the other end was one-half of an inch lower in the mastoid canal; that the locations referred to are in the mastoid region. He was then asked the following questions and answered as follows:

"Q. Dr. Semmes, I would like to ask you this hypothetical question: Assuming that a young woman, suffering from a mastoid infection, submitted to an operation on the mastoid, and that before, and up to the time she went on the operating table her face was normal, and she had no signs, symptoms, indications or complaints of facial paralysis, and when she came out from under the ether following the operation her face was paralyzed on the side where the

mastoid had been operated on, and the paralysis continued for several months, what, in your opinion caused the paralysis? A. There are a number of things which cause paralysis of the facial nerve, swelling of the nerve trunk, inflammation and injury being the most common. Assuming that the face was not paralyzed before the operation and was immediately afterwards, the most likely of these causes would be some sort of injury to the nerve.

"Q. By 'injury' do you or not, mean traumatic injury? A. Yes.

"Q. What are the most common traumatic injuries to the facial nerve following an operation? A. The nerve is sometimes bruised; sometimes the bone is pushed down against the nerve, compressing it, or the nerve may be lacerated or cut.

"Q. Now Doctor, assuming all of the facts stated in the foregoing hypothetical question, and assuming further that the paralysis continued for four months following the operation and another operation was then performed and the facial nerve was found to be completely severed, and the two ends very much swollen, please state whether or not in your opinion the facial nerve was severed while the mastoid operation was being performed? A. From an examination of the nerve which had the usual bulb on the inner end and not on the other end, it would be impossible to say whether it was due to cutting or sloughing—it would be just a mere question of probability."

He was then asked and answered as follows:

"Q. Taking into consideration the history of Mrs. Calhoun's case, as you got it from Dr. Fraser, and your knowledge of her condition gained from the operation which you performed upon her, please state whether or not, in your opinion, her facial nerve was severed while the mastoid operation was being performed? A. I have no means of knowing whether it was cut or sloughed, and I would have to base my opinion purely upon probabilities which has already been stated.

"Q. So, as I understand you, taking into consideration the history of Mrs. Calhoun's case, as you got it from Dr. Fraser, and your knowledge of her condition, gained from the operation which you performed upon her, your opinion is that the facial paralysis was caused either by the facial nerve being cut or so damaged by trauma as to cause it to slough? A. Yes."

He was then asked and answered as follows:

"Q. Doctor, where the facial nerve has been severed, is it not true that the operative treatments for it are a direct suture, by which the severed ends are brought in contact and sutured, or a nerve graft? A. The paralysis can be remedied in three different ways; by removing the bony compression and freeing the nerve from scar tissue, by direct suture when the nerve endings are close enough together, and third, by inserting a nerve graft between the two ends when

they are too far apart to permit of suturing. And by transplantation of some other nerve into the distant end of the nerve, but this had been replaced by the preceding methods.

"Q. In a case where the nerve has been completely severed of course we have eliminated the first treatment that you mention, removing the bony pressure? A. Yes.

"Q. So the remaining treatments are direct suturing and a nerve graft? A. Yes."

Dr. Semmes also stated that if a direct suture is possible it is far more preferable than a nerve graft, but that the nerve graft gives equally as good results. He stated that in cases of direct suture the ends of the severed nerve are freshened up and sewed together. He was then asked and answered as follows:

"Q. Now, after the facial nerve has been severed for four months, it is not possible to utilize the severed portion of the facial nerve is it? A. Yes, if they are long enough, time wouldn't preclude this method of suturing.

"Q. You mean the nerve will live after it has been severed for four months? A. No, but the cut end is just as available. In other words, the distant end has to be utilized anyway, as well as the graft, because the nerve fibres must grow through the graft and into the old cut nerve.

"Q. How long does the distant end of a nerve live after it has been severed? A. The nerve itself is available for many years; the disintegration from time is principally in muscles.

"Q. Is it not true that for a direct suture to be successful or in any way effective, the suture must be made before the severed portion of the nerve dies? A. No, the nerve is still available, as I have just stated, for a period of years.

.  .  .  .  .  .  .

"Q. Doctor, in the case of a direct suture immediately following the severance of a facial nerve, do you or not in those cases where it is successful save the severed portion of the nerve itself? A. No, there is no difference in the process or repair, except in one instance a gap must be traversed through a prepared graft."

He further testified that if the nerve had been severed there would not be any sloughing, unless one or the other of the ends was crushed or inflamed, in which case it would depend upon the amount of damage: that it would probably not be any detriment in the distant portion, but in the near portion to the brain, you would have that much more of the nerve fibres destroyed. He further testified that it was not possible to perform a direct suture when he first operated on the plaintiff. He was then asked and answered as follows:

"Q. Is it not true that after a facial nerve has been severed, the ends gradually recede and become farther and farther separated as a result of contraction and disintegration of the severed ends? A.

Separation may increase in the beginning, but the ends soon become fixed and there is little if any separation in the mastoid portion of the facial nerve because of its position in the bony canal which fits up closely.''

The witness then described the location of the facial nerve and the course that the nerve takes from the time it enters the mastoid until it enters the face, and stated that it traverses a curved course, but that it could be more accurately described by an otologist than by himself. He stated that its location with reference to the mastoid antrum that it would be below and behind—, that it would be above in part of its course and behind, internally.

He was then asked to describe the mastoid process, but replied that this also could be answered much better by an otologist. He also testified that when the mastoid was reopened by Dr. Blassingame and the ends of the nerve exposed, as far as he knew the facial nerve was in the normal position, but that the missing part of the facial nerve may have traversed this course, but there would be no way of ascertaining that, as he and Dr. Blassingame could only see the ends. He then stated that he would like to mention the fact that he was not an otologist and that his opinion as to the normal position was not that of an expert.

The witness testified that he inserted a graft which brought the two severed portions of the nerve together in the space where the gap was made between the ends of the nerve; that the graft was sutured, sewed to both of the ends and traversed the distance between the two ends in a straight line, allowing enough slack to prevent tension. He was then asked and answered as follows:

''Q. Doctor, in performing a mastoid operation, I take it it is necessary to cut completely through the skin, down to the bone, and then to cut through the mastoid process, and that in the operation, it is necessary and a necessary incident to the operation that the skin be cut, and the mastoid bone be cut or chiseled? A. Yes.

''Q. But is it a necessary incident to any mastoid operation that the facial nerve be cut or mashed, like it is to cut through the skin or cut through the bony process? A. As far as I know an otologist always has in mind and attempts to preserve the integrity of the patient's facial nerve.

''Q. And in so far as you know, it is never a necessary incident to the operation, such as the incidents I have mentioned? A. It is not necessary, but it happens.''

He then repeated that he did not do mastoid operations; that that was the work of an otologist.

He was then asked and answered as follows:

''Q. Doctor, please tell us whether or not, in your opinion, it is more desirable and more effective to treat the severed facial nerve as soon as possible after the severance whether the treatment be either

direct suture or a nerve graft. A. If you known that the nerve is severed, it is better to suture it at once, but if a graft is to be put into position, it is better to wait until the infection has entirely disappeared.''

He also stated that it was better to do a nerve graft operation after the infection has cleared up and stated his reasons therefor. He stated that where a nerve graft is required it should not be performed until the infection has entirely disappeared. He also stated that ''However, a notable authority states that it should be allowed to degenerate for six months in order to prevent twitching of the muscles of the face after the regeneration of the nerve has taken place.''

On cross-examination Dr. Semmes testified that his work in surgery was confined entirely to surgery of the nervous system and had been for many years; that he did not do any surgical operations in the field of otology; that he had never done an operation in the otological field. He testified that Dr. Blassingame worked with him in the work that he did on Mrs. Calhoun; that the part of the work performed by Dr. Blassingame was to open the mastoid region and bring the nerve ends into view; that that work was the work of an otologist; that he was present all the time that Dr. Blassingame was engaged in that part of the operation. He was then asked and answered as follows:

''Q. Now, Doctor, have you ever seen cases where the infection of mastoiditis was of such deepseated character as to eat under this bony covering of the facial nerve? A. Yes.

''Q. Does that expose the nerve and deprive it of the covering that nature provided for its protection? ·A. It exposes it to the inroads of either disease or injury.''

He testified that he had seen cases where the facial nerve had been destroyed by infection without any operation. He was then asked and answered as follows:

''Q. Now, doctor, under the circumstances under which you found it, at the time that you operated and the condition that you found it in, would it have been possible to suture this nerve at that time? A. At what time?

''Q. At that time that you found it. A. No, I couldn't get it together. It was too far apart.

''Q. Now, in the case of an injury to a nerve—assuming that a nerve is severed or cut, wouldn't it have a tendency to separate, or does it lie about where it would lie when it is severed? A. It depends on the nerve. A nerve in one of the arms or legs, there is some elasticity there, and you can get in there and pull it a bit without more trouble. It will give a good deal. However, a facial nerve does not move much, because it lies in a bony canal, and there would be very little movement in a case there.

"Q. Now, doctor, assume that you had gone into the area of Mrs. Calhoun there two or three days after the original operation was present—or I mean, after the original operation had been performed, would you have been able to have sutured this nerve at that time if you found it in the position you did at the time you went in there?"

This question was objected to and the objection sustained, whereupon the witness was asked and answered as follows:

"Q. Well, assume that it was in the same position and condition three or four days after the operation that you found it in at the time that you went there, would it have been possible to suture in that case, or would a graft have been necessary? A. A graft would have been necessary."

The witness also testified that after an operation for mastoiditis there is infection present for some considerable time after the operation. He also testified that in good surgery the graft should not be put in while the infection is present. He testified that in doing a nerve graft there must be a clean field and free from infection and that the nerve graft operation should be delayed until all the infection has subsided. He also testified that if the field was clean, free from infection, they could do the graft promptly and that cases had appeared where the paralysis had lasted for as long as three years, and then go in and perform the nerve graft operation with good results, and that that was true in cases where the muscles had shriveled up, but he testified that the time to operate most favorably should ordinarily be as soon as the infection is clean, and before the time that the muscle would shrivel up, say "within a year."

The witness had already testified that there would have been but little, if any, change in the position of the nerve from the time the operation was performed by the defendant to the time he performed the nerve graft operation; that in this situation he could not have sutured because of the space, about one-half of an inch, and that a nerve graft would have been the necessary operation to bring the two severed ends together.

The above is substantially the evidence introduced by the plaintiff at the time of the trial of the case. There was no evidence offered by plaintiff to reflect that the operation performed by the defendant for the mastoiditis was not skillfully performed.

The defendant introduced as witnesses in his behalf several surgeons who specialized in otological surgery in the city of Memphis, Tennessee. It is from the testimony of these witnesses introduced by the defendant that we, in the beginning, stated the nature of the mastoid process, the anatomy of the facial nerve, and other matters referred to therein. We deem it unnecessary to repeat here what was reflected by the evidence of these witnesses as to these matters.

The record reflects that the defendant is recognized as a skilled surgeon in this particular field of surgery. The evidence also reflects

that the operation for mastoiditis was entirely successful. It is shown by the record that this is a very delicate operation and requires a high order of skill in successfully performing it. In fact, there is no evidence to the contrary. Dr. Lewis, who assisted the defendant in performing the original operation, a specialist in the same line of surgery, and especially selected by plaintiff to assist Dr. Fraser, the defendant, in the operation, testified that the operation was skillfully performed; that he was present all the time and that he assisted in the operation. As to the technique employed by Dr. Fraser in performing this operation all of the specialists introduced on the subject, testified that the technique,. as well as the instruments used by the defendant, was recognized as among the best employed in this type of surgery and in doing this particular type of operation.

These specialists, including Dr. Blassingame, Dr. Lewis, and Dr. Ellett, all testified that as to the location and protecting structure of the facial nerve, referred to as No. 7. They all testified that even where the highest degree of care and skill is employed by the operating surgeon, injury to the facial nerve sometimes results. The field of operation can not always be kept perfectly clean even though a high degree of care is employed. This, due from the hemorrhages resulting from diseased structure and tissue in the immediate region of the operation. It appears that there are different methods used. As stated by Dr. Fraser, the condition of the mastoid in the case of mastoiditis varies with different patients, and depends largely upon the extent of the infection. On this subject he testified as follows:

"It is naturally a different picture from this. It is naturally a wet specimen in the field of operation—you have many things to contend with—you have blood constantly—you have granulation tissue, polyp formation, and degenerative bone, and all that sort of thing to contend with as you work and proceed with the operation."

Dr. Fraser is corroborated by all the medical experts who testified at the hearing. It is shown by the expert testimony that the tendency of the infection in mastoiditis cases is to decay out the bony structure within the middle ear and frequently obliterates the various land marks. The land marks that operate as a guide to the surgeon in many cases are destroyed by the mastoid infection. For instance, Dr. Semmes testified as follows:

"Q. Now, doctor, have you ever seen cases where the infection of mastoiditis was of such deepseated character as to eat under this bony covering of the facial nerve? A. Yes.

"Q. State whether or not in your experience you have found cases where over a long period, by reason of the length of time of the infection or the virility, you have found few or many of the land marks in the ear obliterated or destroyed by the infection present? A. Yes, I frequently have found land marks obliterated.

"Q. Have you seen cases where the infection was to such an extent

that it would affect the inner structure of the ear and erode the facial canal, the bone? A. Yes.''

It appears from the record without contradiction that plaintiff had been afflicted for many years with a disease of her right ear. It also appears that the disease is progressive, and the longer that it is permitted to run the more deepseated and virulent the infection becomes. In the present case the condition of her ear was such that it required the radical type of operation. There is no conflict in the evidence as to this. There is no conflict in the evidence but that the operation performed by the defendant was skillfully performed, except the fact alone that the facial nerve, located in the immediate region of the mastoid structure was injured, probably cut.

It appears without conflict in the evidence that an infection from mastoiditis has a tendency of eating into the bony structure of the mastoid region. It also appears without conflict in the evidence that it became necessary for the defendant, in performing the operation, to remove the diseased tissue and diseased and infected portions of the bone in the mastoid region, and to completely hollow out the entire mastoid region to relieve it of infection. It also appears without conflict in the evidence by the testimony of the medical experts that all the infected tissue cannot be entirely removed, but that the infection will clear up in the course of time and in the process of clearing up the ear will continue to discharge for a time, until the infection is cured. In the present case there were discharges from the ear up until about the time of the operation performed by the Drs. Semmes and Blassingame.

It also appears without conflict in the evidence that when the facial nerve is severed in the course of an operation there are two methods of repair. One is by suture, or sewing the two severed ends together, and the other is by graft. Dr. Semmes, an expert in the field of nerve surgery, and a witness for plaintiff, testified that when he performed the graft operation, assisted by Dr. Blassingame, there was a space of about one-half of an inch between the two severed ends of the facial nerve, and because of the location of the nerve canal, very little contraction of the nerve ends would have resulted from the time of the operation performed by the defendant and the time he performed the graft operation. He also testified that because of the space between the two ends of the nerve, the suturing method of repair could not be used because the ends could not be drawn together. The whole effect of his testimony on that subject is that even if a repair of the severed nerve had been made promptly after the operation performed by the defendant, that the graft method of repair would have been the only method that could have been used.

It also appears without conflict in the evidence that it is not safe or good surgery to perform a graft operation until the infection has first cleared up, and that this requires several months.

The learned trial judge by his action in directing a verdict in favor of the defendant held that on these matters and questions it was peculiarly within the scientific knowledge of medical experts, and did not present a question that could be determined by a jury of laymen without entering into the realm of speculation.

Plaintiff has cited and relies upon certain authorities in support of the contention that the rule of res ipsa loquitur applies to the facts of the present case.

Appellant makes the contention, among others, that the location of the facial nerve was not within the region of the mastoid and was outside of the field of operation, and therefore when it appears that the facial nerve is injured in the course of the operation by the defendant the rule of res ipsa loquitur would apply, and cites certain authority in support of the contention thus made.

Among other cases cited and relied upon by appellant on this subject is the case of Vergeldt v. Hartzell, 8 Cir., 1 F. (2d), 633, 634. In that case the suit was against a dentist for injuring the roof of the patient's mouth while drilling on a tooth. In this case the court stated:

"The trial court seems to have assumed that, unless this was a case for the application of the rule of res ipsa loquitur, no evidence sufficient to warrant submission to a jury is shown in the record. Possibly the trial court was right in this respect, for the line of demarcation between evidence supplied by the circumstances of the accident itself and other evidence closely related thereto is sometimes very dim. The instant case is one of that character. Whether the act of Dr. Werrick in turning his head to look at or for something upon the instrument table at the precise time was one with respect to which 'the thing speaks for itself,' or whether it is to be considered as independent positive proof, is a matter upon which minds and courts might readily differ. We do not think it very material, however, in what manner it is regarded. The trial court held, expressing approval of the reasoning of the Supreme Court of Wisconsin in Vale v. Noe, 172 Wis., 421, 179 N. W., 572, that the doctrine of res ipsa loquitur does not apply to cases of the character of the one under consideration. We are not prepared to follow the trial court to this conclusion. While the facts in Vale v. Noe, supra, agree quite closely to the facts in the instant case, the brief notice given by the Wisconsin court to the doctrine under consideration is not to us convincing. No authority was cited by the court in that case and none is cited in the briefs of counsel here which seem to sustain such a conclusion."

In the Vergelt case the court cited and quoted from certain other cases. All the cases cited and referred to by the court were cases where the injury resulting to the patient in the course of an operation was to a part of the anatomy not within the region being

operated upon. Certain illustrations are given, for instance, where a surgeon, operating for the removal of a tumor on the head, permitted the knife to slip and to cut off the patient's ear; or where the physician gives an overdose of poison to a patient; or where a surgeon operating for the removal of the tonsils, permitted the knife to slip and cut the patient's tongue. However, in the Vergelt case it was specifically recognized that the general rule is that in straight malpractice cases, which only involve the question of the skill of the physician or surgeon in performing operations or in administering treatment, the case must be controlled exclusively by expert testimony, and that any other rule would require the jury to reach a decision by speculative methods. This, on the theory that laymen are not capable of determining purely scientific questions. It is only where the injury must have resulted from negligence that the rule of res ipsa loquitur would ever become applicable.

In the concluding portion of the opinion in the Vergelt case the court quoted from the case of Wharton v. Warner, 75 Wash., 470, 475, 135 P., 235, approvingly, as follows: "Whether a surgical operation was unskillfully or skillfully performed is a scientific question. If, however, a surgeon should lose the instrument with which he operates in the incision which he makes in his patient, it would seem as a matter of common sense that scientific opinion could throw little light on the subject."

Appellant also cites and relies upon a very recent case by the Eastern Section of this court. The case of Meadows v. Patterson, 21 Tenn. App., 283, 109 S. W. (2d), 417, 419, and certain expresssions contained in the opinion in that case, in support of the proposition that the rule of res ipsa loquitur would apply in the present case. In that case the court stated: "It is generally held that this doctrine has no application to the ordinary malpractice case (Loudon v. Scott, 58 Mont., 645, 194 P., 488, 12 A. L. R., 1487; 48 C. J., 1142), the reason for denying its application being that a physician or surgeon does not undertake to insure a recovery and that the result of medical treatment and surgery is, ordinarily, so uncertain that no inference of negligence attends a failure to effect a cure. However, where, as in this case, the liability of the physician or surgeon is predicated upon alleged negligence for want of reasonable care of the patient while unconscious and not upon an alleged want of skill in diagnosis or treatment, we think a practical administration of justice dictates the application of the doctrine when it appears that a sound and unaffected member of the body is injured or destroyed while the patient is unconscious and under the immediate and exclusive control of the physician. In no other way, under usual and ordinary conditions, could the patient obtain redress for such an injury, and it is no hardship upon the defendant to explain, as he alone can, how the injury occurred."

That was a case in which the surgeon had operated on the patient for appendicitis, and after the operation had been performed and the patient had been returned to his private room in the hospital, where a nurse was left with the patient, in some unexplained way, the patient injured his eye, apparently by gouging his eye with his finger nail. The court held in that case that while there were cases growing out of surgical operations and treatments by physicians (such as above referred to) for the application of the rule, that it could not be applied in that particular case. We do not think that this case goes further than to recognize that where the injury complained of is so disconnected from the operation itself, and the fact that the injury did result where such an injury could not result from the operation or treatment, except by some act of negligence, that the rule would apply.

There is authority to sustain the rule that where the cause of action is based exclusively upon the negligence of the surgeon or physician, by some negligent act, that could not ordinarily result from a careful or skillful treatment or operation, that the rule of res ipsa loquitur may be applied.

In the present case it is shown by all the medical expert evidence that the facial nerve, where it was injured by the operation, is located in the immediate region of the field of operation for mastoiditis. In fact, there is no evidence to the contrary. The very fact that the expert testimony recognizes that there is always danger of injuring the facial nerve because of its position with respect to the mastoid region, that provision for unusual care should be made, shows without question that in performing this type of operation there is always danger of injuring the facial nerve. It also appears that injury may result to the facial nerve in the course of an operation by the surgeon even where the operation is performed with the highest degree of care and skill. In this situation we can not escape the conclusion that the case calls for the opinion of expert evidence.

It is too well settled to require the citation of authority that a jury may never be permitted to reach a verdict upon pure speculation. We think in the instant case there could have been no verdict by the jury based upon any proven facts, or legitimate inferences to be duduced from the proven facts, and hence, any verdict would essentially be the result of pure speculation.

In the case of Oliver v. Transfer Co., 17 Tenn. App., 694, 71 S. W. (2d), 478, 480, it was held: ". . . If the defendant's explanation establishes the absence of negligence so clearly as to leave no substantial conflict in the testimony or issuable fact for the jury to pass on, the presumption will be overcome as a matter of law."

We think it is also equally well settled that a failure to use some particular type of instrument in performing the operation, where

the instruments used in the operation are shown to have been of an approved type for use in performing this particular operation, no negligence will be presumed because another type of instrument was used. Jensen v. Findley (1936), 17 Cal. App. (2d), 536, 62 P. (2d), 430; Bouffard v. Canby (1935), 292 Mass., 305, 198 N. E., 253; Gruginski v. Lane (1934), 177 Wash., 121, 30 P. (2d), 970; Jackson v. Burton (1933), 226 Ala., 483, 147 So., 414. So, the question made by appellant that there were certain other instruments recognized by the medical and surgical profession which were not used by the defendant, does not make a case of presumptive negligence, where it is shown that the instruments used by the defendant and his technique were up to the recognized standard of efficiency and skill, becomes immaterial and can not be relied upon as any evidence of negligence. See cases above.

In the present case we think the conclusion is inescapable that there was no evidence warranting the submission of the issues to the jury. We think the learned trial judge is entirely correct in holding that under the facts of the present case, only questions of science, calling for expert evidence by recognized surgeons in this particular field of surgery must control. Otherwise a jury verdict would essentially have to be based upon pure speculation.

Without further prolonging this opinion, and after a very careful consideration of all the testimony, we reach the conclusion that all assignments of error must be overruled and the judgment of the lower court affirmed.

Appellant will pay the costs of this appeal.

Ketchum, J., and Adams, Sp. J., concur.